UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMINIC MAHER,<br><br>                Plaintiff,<br><br>   -against<br><br>NEW YORK CITY POLICE DEPARTMENT<br>OFFICER PHILLIP HOENSCHEID,<br><br>                Defendant. | **COMPLAINT**<br><br>Docket: 25-cv-6249<br><br><br>JURY TRIAL<br>DEMANDED |

## INTRODUCTION

1. This case involves a police officer's false report of information to the New York City Administration for Children's Services ("ACS"), which the ACS then relied upon in removing a single father's two children from his home. In the desperate panic that ensued from being robbed of his children, the victim-father, Dominic Maher, was forced into criminal and administrative proceedings that ultimately terminated in his favor upon the discovery of these falsehoods. But not before Dominic's two 3-year-old children were removed away from their father, for an entire week—each second of which caused Dominic immeasurable anxiety, pain and suffering. He brings the present action seeking compensation for the extraordinary damages he suffered by virtue of the Defendant's fabrications.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as claims in this action arise under 42 U.S.C. § 1983.

3. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose.

# PARTIES

4. Plaintiff, Dominic Maher, is a resident of the State of New York and brings the present suit in his individual capacity.

5. Defendant New York City Police Officer Philip Hoenscheid ("Officer Hoenschied") was at all relevant times a police officer in the New York City Police Department and was acting under color of state law and in the scope of his employment.

# FACTS

### *Dominic is Attacked by a Volatile Neighbor*

6. Between 2-3pm on March 19, 2025, 61-year-old Dominic Maher was in the lobby of his building, located at 33-16 81st Street in Jackson Heights, Queens, waiting for the elevator.

7. When the elevator came, he opened the door, and he held the door for two other (married) residents ("Neighbor 1" and "Neighbor 2") as they exited the elevator.

8. Neighbor 1, who had acted irrationally and aggressively toward Dominic in the past, turned to Dominic and continued this behavior—stating in sum and substance, "I will fuck you up. You want a piece of me?"

9. Dominic knew to ignore him and got into the elevator. Yet on this occasion, Neighbor 1 extended his verbal harassment into a physical attack—lunging at Dominic, pushing him back against the wall in the elevator, hitting him in the face and causing a nosebleed, and then kicking him in the shin and causing a bloody gash.

10. The police were called, responded and interviewed both men. Dominic told the police that he did not want to press charges; he just wanted Neighbor 1 to stop threatening and assaulting him.

### *Dominic's Children Are Safe at Home with a Caretaker*

11. Dominic's two minor children (L.M. and G.M.) live with him, and they have two regular caretakers to shoulder some of his burdens as a single parent. One is their nanny (the "Nanny"), who speaks English and also attends school; and the other is the Nanny's mother, who does not speak English.

12. While the attack and investigation recited above transpired, L.M. and G.M. were upstairs in his apartment and safe with their caretaker—the Nanny's mother.

13. By 9:00 p.m., many hours after the assault, and now after the caretaker left and Dominic was home with the children who were sleeping, Officer Hoenscheid and other officers returned to the apartment and knocked on Dominic's door.

14. He answered and asked the police to be quiet because the children were sleeping.

15. The police told Dominic they were arresting him and asked him if he had someone to call to watch the children.

16. Because the Nanny is a devout Jehovah's Witness and requires that she be left undisturbed on Wednesday evenings, Dominic advised that he had no one to call for the children.

17. The police expressed concern that there was no biological mother in the picture, arrested Dominic, and put the children with Child Protective Services ("CPS").

### *Officer Hoenscheid Makes a False Report to ACS*
### *Causing Dominic to Lose Custody of His Children*

18. On March 20, 2025, shortly after midnight, Officer Hoenscheid called in a report to the State Central Register ("SCR"). Hoenscheid then told ACS agent Takiyah Khabir a fabricated version of what happened.

19. In particular, Officer Hoenscheid reported that Dominic assaulted his neighbor in the elevator of his apartment building—and added the following claims:

   a. "[T]he children were found in the home alone following the altercation";

   b. It was 90 degrees inside the apartment;

   c. He suspected the children were being locked in their room as he found a padlock on the outside of their door; and

   d. L.M. had a suspicious injury on his leg which appeared to have been inflicted on him.

(the "Claims to ACS").

20. Later the same day, Hoenscheid spoke with ACS agent Elizabeth Louis and told her the same story.

21. In truth, the children had not been found alone and at all relevant times were either with their caretakers or with their father until Hoenscheid arrested him; the apartment was not anywhere close to 90 degrees, indeed it was a winter day in March, and Dominic was sleeping in the same bedroom as his children who at the time of his arrest were fast and comfortably asleep; the children had not been locked in their rooms, there was absolutely no padlock, the doors were not locked when the police arrived in any fashion, and indeed the mechanism cited by the Defendant was a contraption on the door designed

to keep the door open—not closed; and the "injury" on L.M.'s leg was a scab from a bug bite.

22. Having been given this false and reckless set of reports, CPS applied for an emergency *ex parte* order removing the children from Dominic's care. They also filed two neglect petitions, one on behalf of each child. The petitions were filed in the name of Jess Dannhauser, Commissioner of Administration for Children's Services and signed by counsel Christa Santulli of ACS.

23. The children were taken to Elmhurst Hospital and were in good condition; they were then taken to the Children's Center at 492 1st Avenue for placement.

24. Ultimately, New York City permitted the Nanny and her mother to take the children while removal proceedings were pending—but forbade Dominic from engaging in his regular role as their father.

25. This all happened while Dominic was in NYPD custody.

26. When he was released after being arraigned on March 21, 2025, he learned that his children had been removed on the ground that a determination had been made that they were in immediate danger—which was blatantly false.

### *Dominic Prevails in Court to Secure the Return of His Children*

27. Through counsel, Dominic commenced a hearing, and ACS called the CPS worker, Elizabeth Louis.

28. The court became visibly frustrated after learning about the true facts and encouraged ACS to rethink its case.

29. The court ultimately dismissed the petitions as to both children with pediatric clearance. The children were seen by the pediatrician and promptly returned home to their father—Dominic.

30. The criminal case against Dominic was subsequently dismissed as well after two court appearances.

## CAUSES OF ACTION

### FIRST: MALICIOUS PROSECUTION UNDER 42 U.S.C. §1983

31. Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

32. The Defendant initiated child-removal proceedings against Plaintiff in New York City by furnishing the Claims to ACS which were knowingly and materially false and caused CPS to bring the administrative proceedings to take Plaintiff's children from him.

33. Defendant lacked probable cause to believe that the removal proceedings were warranted or likely to succeed, knew that he lacked probable cause, and that is why he resorted to the fabricated Claims to ACS to help secure the removal.

34. The removal proceedings terminated in Plaintiff's favor and his children were returned to him and the proceedings were dismissed.

35. Plaintiff suffered a substantial deprivation of his liberty interests, including his fundamental right to see and care for his children and having to remain subject to the court's orders during the pendency of child-removal proceedings.

36. Defendant acted during all relevant times with actual malice – making the Claims to ACS without probable cause, without the pursuit of justice, and instead to serve alternative goals including, but not limited to, obtaining professional credit for himself.

37. Plaintiff suffered substantial damage from the malicious prosecution, including extreme emotional distress from the temporary loss of custody of his children, which will continue indefinitely.

38. In addition to compensatory damages, Plaintiff is entitled to punitive damages in light of the extraordinary degree of wrongdoing.

39. Plaintiff is entitled to attorneys' fees under 42 U.S.C. §1988(b).

**SECOND: EVIDENCE-FABRICATION UNDER 42 U.S.C. §1983**

40. Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

41. Defendant was an investigating official on scene at Plaintiff's residential building.

42. Defendant intentionally fabricated the Claims to ACS and forwarded them to ACS knowing that ACS would rely upon them in deciding whether to pursue, and how to pursue, child removal proceedings.

43. The Claims to ACS were at all times likely to influence the outcome of the removal proceedings.

44. Plaintiff's parenting and custody rights over his children, including their care, custody and management, are liberty interests protected by the Due Process Clause of the United States Constitution.

45. Plaintiff has a substantive Due Process Right, as well, to fair child-removal proceedings that are not stained by the conscience-shocking and egregious use of knowingly false information like the Claims to ACS.

46. Plaintiff suffered a deprivation of liberty as a consequence of the fabricated Claims to ACS, including the loss of his liberty interests in his children for an entire week.

47. In addition to compensatory damages, Plaintiff is entitled to punitive damages in light of the extraordinary degree of wrongdoing.

48. Plaintiff is entitled to attorneys' fees under 42 U.S.C. §1988(b).

### THIRD: ABUSE OF PROCESS UNDER 42 U.S.C. §1983

49. Plaintiff repeats and realleges all prior paragraphs in this Complaint as if set forth again herein.

50. Defendant participated in the issuance of legal process against Plaintiff to remove his children.

51. Defendant intended to do harm to Plaintiff without justification, including but not limited to causing the removal of his children based upon the Claims to ACS that he knew or should have known were false, and which he forwarded to ACS because he thought they would further collateral objectives like his own career advancement.

52. Plaintiff was damaged as a consequence of the abuse of process, including but not limited to loss of liberty as well as emotional and physical distress.

53. In addition to compensatory damages, Plaintiff is entitled to punitive damages in light of the extraordinary degree of wrongdoing.

54. Plaintiff is entitled to attorneys' fees under 42 U.S.C. §1988(b).

**WHEREFORE**, Plaintiff prays for relief as follows:

    A.    That the Court award compensatory damages to Plaintiff and against the Defendant in an amount to be determined at trial;

    B.    That the Court award punitive damages to Plaintiff, and against the Defendant, in an amount to be determined at trial that will deter such conduct by defendants in the future;

    C.    That the Court award attorney's fees pursuant to 42 U.S.C. § 1988;

    D.    For a trial by jury;

    E.    For a pre-judgment and post-judgment interest and recovery of their costs; and

    F.    For any and all other relief to which they may be entitled.

Dated: Garden City, New York
November 10, 2025

**BARKET EPSTEIN KEARON
ALDEA & LOTURCO, LLP**

By: /s/ *Alexander Klein*
Alexander Klein, Esq.
Danielle Muscatello, Esq.
666 Old Country Road, Suite 700
Garden City, New York 11530